West Virginia Northern Railroad Company v. Commissioner.
West Virginia N. R. Co. v. Commissioner
Docket No. 66805.
United States Tax Court
T.C. Memo 1959-204; 1959 Tax Ct. Memo LEXIS 45; 18 T.C.M. (CCH) 975; T.C.M. (RIA) 59204; October 28, 1959
C. Walter Randall, Jr., Esq., 2301-71 Packard Building, Philadelphia, Pa., for the petitioner. Max J. Hamburger, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: This proceeding involves deficiencies in income tax and an addition thereto as set forth below: Addition to
Tax Under
Year
Deficiency
Sec. 291(a)
1951
$11,355.42
$567.78
1952
20,035.93
1953
13,718.66
The issue for decision is whether the amounts of $19,982.40, $36,407.94, and $29,590.43, paid by the West Virginia Northern Railroad Company during each of the years 1951, 1952 and 1953, under a lease agreement for the rental of two diesel locomotives, constituted rent deductible as an ordinary and necessary business expense under section *46 23(a) of the 1939 Internal Revenue Code. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. During the years in issue, the West Virginia Northern Railroad Company (hereinafter referred to as the petitioner), a West Virginia corporation, maintained its principal place of business at Kingwood, West Virginia. It filed its Federal income tax returns for the calendar years 1951 through 1953 on an accrual basis with the director of internal revenue at Parkersburg, West Virginia. At all times material hereto, petitioner owned and operated 11 miles of railroad track, plus facilities, running between the towns of Kingwood and Tunnelton, West Virginia. This line was operated as a feeder road for the Baltimore and Ohio Railroad. On June 14, 1946, petitioner, as lessee, and four of its five stockholders, as lessors, entered into an agreement for the lease of two diesel locomotives owned by the four stockholders. It was provided that the lease was to run for 5 years at a monthly rental computed at the rate of 7 1/2 cents per net ton of freight hauled by petitioner over its tracks. On December 30, 1950, petitioner's *47 1,000 shares of outstanding stock were owned as follows: Owner
Shares
James Jenkins
600
James Jenkins, Jr.
100
Violet Oberhaus
100
Rheta Leimbach
100
Marguerite Ross
100
Total
1,000 James Jenkins, the father of the other four stockholders, was the only member of the group who had not participated in the diesel lease of June 14, 1946. The abovenamed members of the Jenkins family were also the owners of 25,000 acres of coal lands located in Preston County, West Virginia. On December 30, 1950, petitioner's stockholders granted an option to the Preston Coal Company, exercisable on or before July 1, 1951, to purchase all petitioner's outstanding stock for $500,000, provided the Preston Coal Company should exercise an option independently acquired by it from those same stockholders to lease, or purchase, the 25,000 acres of coal properties which they owned. The stock option provided that the $500,000 purchase price was payable $50,000 in cash, and the balance in 15 annual installments. It further provided, in the event of exercise, that the optionee would agree to a 25-year extension of the diesel locomotive lease at the existing 7 1/2 cents per freight ton *48 rental. It was also agreed that, prior to the option termination, there were to be no adverse changes in the balance sheet of the petitioner, nor any changes in its capital structure. By virtue of the second option, the Preston Coal Company, as optionee, acquired the right to purchase 25,000 acres of coal properties owned by the optionors at $50 per acre. In the alternative, the optionee was given the right to lease these properties at a royalty of 10 cents per ton of coal mined and sold, with a stated minimum royalty of $30,000 per year. On March 19, 1951, the Preston Coal Company assigned to Ralph R. Lewis its entire interest in the option agreements. Thereafter, Lewis notified the Jenkins family that he intended to exercise both options. On September 24, 1951, at a meeting between the parties and their representatives, James Jenkins advised Walter Biddle Saul, Lewis's attorney, that he (Jenkins) felt the terms of the stock option failed to provide his family with adequate security. More particularly, he was concerned that, though the purchase price was payable over a 15-year period with only a $50,000 down-payment, the stock itself was to be turned over to Lewis immediately *49 with no additional security. Further, though the option called for installment payments, no note for the unpaid balance was required from the purchaser. In addition, Jenkins felt there was nothing to prevent the purchaser from distributing petitioner's surplus to himself once he gained control of its stock, even though the purchase price of that stock might not yet have been fully paid. Saul was sympathetic to some of Jenkins' fears, and accordingly agreed to certain changes in the option agreements. Thereupon, the option on the coal lands was modified so as to provide for the leasing of only 19,660.81 acres, for a term of 15 years for a minimum royalty of $20,000 instead of the original $30,000 figure. The stock option was modified so as to provide that the balance of the purchase price, after payment of the initial $50,000, be secured by the execution of a collateral note payable in 15 annual installments, the stock to serve as collateral for that note. Further, James Jenkins was given the right to name two directors to petitioner's board for a 10-year period. Petitioner was to pay no dividends prior to the consummation of the deal with Lewis, unless to Jenkins to be credited on *50 the payments due on the note, subject to the immediate declaration of a $20,000 dividend to the Jenkins family. Petitioner was not to increase administrative salaries, unless the increase could be paid from current earnings. It was further agreed that petitioner would issue no bonds or debentures which would be superior to the stock held as collateral to the Lewis note. It was agreed that at settlement, the optionors would lend Lewis $90,000 to be used to make the $50,000 initial payment on the stock, a $20,000 initial payment under the coal properties lease, and $20,000 to meet expenses of sale. This $90,000 was to be included in the same note with the $450,000 balance due on the purchase price of the stock, making the total indebtedness evidenced thereby, $540,000. The note was to bear interest at the rate of 2 per cent, and was to call for annual payments of $34,666.66 for 15 years, and, in addition, a $20,000 payment 18 months after the date of its execution. In addition, James Jenkins asked that the rental to be paid by petitioner for the two diesel locomotives be increased to 12 1/2 cents per freight ton; and further, that the term of that lease be reduced to 15 years without *51 any right of cancellation on petitioner's part, save by purchase of the engines for $387,500 cash. Saul refused to agree to these changes in light of the original option provisions providing a lease of 25 years at a rental of 7 1/2 cents per freight ton, as well as providing that petitioner's financial position at settlement should be not materially worse than at the time the options were executed in 1950. It was Saul's view that the increased rental charge reduced the value of petitioner's stock, and therefore the price Lewis was to pay for that stock would have to be reduced correspondingly. The Jenkins family replied that they desired the increased rate, and accordingly would agree to a corresponding reduction in the purchase price of petitioner's stock. Thereupon, the following modifications were made in the diesel lease: its term was shortened from 25 to 15 years; the rate of payment thereunder was increased from 7 1/2 cents to 12 1/2 cents per freight ton; and petitioner was given the right of termination at any time by purchasing the two locomotives for $387,500. It was agreed that: * * *
"The aggregate amount of five cents per ton out of the twelve and one-half cents *52 per ton paid under the equipment contract shall be credited by Jenkins and his children as follows: "a. To the payment of the installments due on the above recited note and the balance, if no installment be due, to the payment then due of the minimum royalties on the coal lands." * * *
Then, petitioner's directors, consisting of the members of the Jenkins family, adopted the new locomotive lease dated September 24, 1951, calling for monthly rental payments at 12 1/2 cents per ton of freight hauled. Inasmuch as the old lease had expired, the new lease was made retroactive to June 14, 1951. As a result of the retroactive effect of the new agreement, petitioner paid the sum of $9,953.75 to take into account the additional 5-cent factor. In addition, petitioner's directors voted a dividend to the Jenkins family, the then stockholders, of $20,000. Thereafter, Jenkins' family resigned as petitioner's officers and directors. A new board of directors, comprised of two Jenkins-designated individuals and two Lewis-designated individuals, was elected. They immediately ratified and agreed to all aspects of the agreements between the Jenkins family and Lewis which were material to the *53 petitioner. Settlement was held, and Lewis gave his note, dated September 24, 1951, in the amount of $540,000 to the Jenkins family. Each month, thereafter, a statement of the number of tons of coal shipped over petitioner's line was prepared and sent to the Jenkins family, showing the total amount due, and the portion thereof in excess of the old 7 1/2 cent rate. The amounts due were paid by the issuance of five individual checks, one to each member of the Jenkins family, each being in the amount of one-fifth of the total amount due. The following sums were paid or accrued by petitioner during the taxable years 1951 through 1953 under the locomotive lease agreement: Taxable
Amount at 7 1/2
Amount at 5
Year
cent rate
cent rate
1951
$53,500.56
$19,982.40
1952
56,170.83
36,407.94
1953
45,965.20
29,590.43 The amounts represented by the 5-cent factor during each of these years were credited against the installments due on the note of $540,000 executed by Lewis in favor of the Jenkins family. On its Federal tax returns for each of the years in issue, petitioner deducted the full amount of the payments made under the locomotive lease agreement to the *54 Jenkins family as "Rent for locomotives." Respondent disallowed that portion of the total payments deducted which represented the 5-cent factor. Opinion The sole issue is whether that portion of the annual amount paid by petitioner under the locomotive lease agreement, as represented by the 5-cent-per-freight-ton factor, constituted a deductible business expense under section 23(a)(1)(A) of the 1939 Internal Revenue Code. No issue with respect to reasonableness of the 12 1/2 cent rate has been raised by respondent. It is petitioner's position that the total amounts paid under the diesel lease were bona fide rental payments necessary to its business, and thus were deductible as ordinary and necessary business expenses. It maintains that when the various agreements are read together, they clearly indicate the additional 5 cents per freight ton was bargained for, and was paid, as rent. It contends the Lewis requirement, that the stock's purchase price be reduced in proportion to petitioner's increased obligation under the new diesel lease, could be effected only by crediting the 5-cent increase against the Lewis note, inasmuch as the leasing rate was made dependent upon an unknown, *55 the number of freight tons to be hauled over petitioner's line. Moreover, it submits that the 5-cent increase was made at the insistence of the Jenkins family, and was contracted for when they, and not Lewis, were in control of the petitioner. On the other hand, respondent simply contends the amounts in issue were paid by petitioner in satisfaction of an obligation of its sole stockholder, Lewis, and therefore do not constitute deductible business expenses. He submits that the contractual provision for the crediting of these sums against the installments due on the Lewis note, or, if no installments were due, against the minimum royalties due on the coal lands, clearly supports his position. The character of the payments in issue must be determined from the intentions of the parties as evidenced by the agreements between them. Ersel H. Beus, 28 T.C. 1133 (1957), affd. 261 F. 2d 176 (C.A. 9, 1958). More particularly is that true here, where the only witness, Lewis' attorney, when asked whether the additional 5-cent factor was negotiated solely to give the Jenkins family security on the Lewis note, replied, "What the Jenkins family had in their mind when *56 they made this suggestion, I can't tell you." A careful consideration of the various agreements between the parties and other background facts has led us to conclude that the amounts in issue were not ordinary and necessary business expenses deductible by petitioner under section 23(a). Though petitioner contends that the credit of the additional 5 cents was necessary to effect a proportionate reduction in the purchase price of its stock, it fails to explain why, should no installments on the purchase price be due, that that credit was to be made against the minimum royalties due under the lease of the coal properties. While the coal lease was executed contemporaneously with the other agreements, there is nothing to indicate that the royalties provided for therein in any way were connected with the purchase price of petitioner's stock. In point of fact, any such relation would appear to be out of the question, inasmuch as the coal lands were leased from the Jenkins family by Lewis as an individual, the petitioner in no way being involved in that agreement. Thus, it seems inescapable that any credit against the coal lease royalties would serve to reduce what otherwise would be a *57 personal obligation of petitioner's sole stockholder, Lewis. Granted no such credits were made against the minimum royalties due under the coal lease during the years in issue; nonetheless, the fact that they were contracted for indicates that the additional 5 cents was not, as petitioner claims, bargained for as rent for the use of the locomotives, but rather provided the means whereby corporate assets could be utilized to satisfy the personal obligations of its sole stockholder. Moreover, it appears from the record that the 5-cent increase was requested by the Jenkins family, to serve as additional security for the Lewis note, and not merely as a means of reducing the purchase price of the stock. At least, such was the understanding of Lewis' attorney as expressed in an affidavit submitted by him to respondent's agents in August of 1955. Additional support for this conclusion is found in the reduction of the term of the locomotive lease from 25 to 15 years, the same number of years which the note was to run. Such circumstances further militate against petitioner's position tha the sums in question represent rent deductible as an ordinary and necessary business expense. It is *58 axiomatic that an income tax deduction is a matter of legislative grace, the burden of clearly establishing the right thereto falling squarely on the shoulders of the taxpayer. It is also fundamental that payments of the expenses or obligations of another are not ordinary business expenses. Welch v. Helvering, 290 U.S. 111 (1930); A. Giurlani & Bro., 41 B.T.A. 403 (1940), affd. 119 F. 2d 852 (C.A. 9, 1941). Therefore, in the light of the facts of this record, we have concluded that respondent properly disallowed the deduction by petitioner of that portion of the annual payments made by it under the diesel leasing agreement as was represented by the 5-cent-per-freight-ton factor. Decision will be entered for the respondent.